## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MARY DOE, an individual known to defendants: | : |
| Plaintiff | : |
| v. | : |
|  | : CIVIL ACTION NO. 04-938 |
| MATCH.COM, INC. | : |
| 3001 George Bush Highway, Ste. 100 | : |
| Richardson, TX 75082 | : |
|  | : |
| and | : |
|  | : |
| MATCH.COM, L.P. | : |
| 3001 George Bush Highway, Ste. 100 | : |
| Richardson, TX 75082 | : |
|  | : |
| Defendants | : |
|  | : |

## ORDER

AND NOW, this _____ day of _____, 2004, it is hereby

Ordered and Decreed, that Defendants' Motion to Dismiss Plaintiff's Complaint is

hereby DENIED.

By the Court:

_____
                                    Giles, J.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

MURPHY & GOLDSTEIN, P.C.
BY: WILLIAM P.  MURPHY, ESQUIRE                    ATTORNEYS FOR PLAINTIFF
I.D. #: 23339
BY: HOWARD K.  GOLDSTEIN, ESQUIRE
I.D. #: 31285
1616 Walnut Street, Suite 2000
Philadelphia, PA 19103
(215) 731-1230

_____
                                                                        :
MARY DOE, an individual known to defendants:
                                                                        :
                              Plaintiff                                 :
          v.                                                            :
                                                                        :          CIVIL ACTION NO. 04-938
MATCH.COM, INC.                                                         :
3001 George Bush Highway, Ste. 100                                      :
Richardson, TX 75082                                                    :
                                                                        :
          and                                                           :
                                                                        :
MATCH.COM, L.P.                                                         :
3001 George Bush Highway, Ste. 100                                      :
Richardson, TX 75082                                                    :
                                                                        :
                              Defendants                                :
_____                               :


**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

STATEMENT OF THE CASE

Although arising from a modern Internet business enterprise engaged in anonymously matching singles for possible romantic involvement, this case invokes one of the oldest and most traditional torts for the protection of personal rights and the dignity of individuals – an action for invasion of privacy principally in the nature of intrusion upon seclusion pursuant to § 652B, Restatement (Second) of Tort. *E.g.*, *Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 620-21 (3d Cir. 1992).

Defendants' online business is not limited to making heterosexual matches. It seeks also to capture the market of customers looking for members of the same sex for dating opportunities. The marketability of this special branch of their service depends even more heavily than usual upon privacy, security and anonymity. The privacy of persons having this sexual orientation is more acute because of social factors that have been known to result in victimizing such persons and that in recent years has even led the United States military to adopt an official "don't ask, don't tell" policy.

Plaintiff placed her trust in defendants by providing private personal information – including her identity, location, e-mail address, credit information, and sexual orientation – in the hope of using the anonymous service to find someone who, like her, was seeking to find someone of the same sex. The information was provided by her freely and trustingly to defendants, who made prolific assurances that her privacy would be honored, so that defendants may serve as the trusted intermediary between plaintiff and potential matches, preserving her anonymity. However, instead of performing the promised role of honest broker, defendants illegitimately invaded her private file containing her identity and other personal information, subjected plaintiff to

2

highly offensive, unsigned and obscene e-mail communications using her e-mail address, appropriated plaintiff's personal e-mail identity and forged unwanted registrations with Internet sex groups causing a cascade of communications with plaintiff via her e-mail as if she had voluntarily joined.  This outrageous behavior was profoundly disturbing and terrifying to plaintiff who suffered an immediate loss of  her solitude and privacy in exchange for a terrifying ordeal whose hateful dimensions were unknown.

These blatant acts of intrusion upon plaintiff's seclusion and privacy were admittedly committed by one or more of defendants' employees who, as alleged in the Complaint, were allowed unbounded freedom to access and use information in defendants' private file to commit such acts. Notably, as also expressly alleged in the Complaint, the corporate defendants themselves participated and were complicit in the employee(s)' commission of the invasion of privacy torts through negligent hiring, training and supervision as well as an inexplicable failure to institute any security measures to guard against the special known danger of  abuse against persons having a same-sex orientation.

Defendants' response to the Complaint as a whole is factually superficial and legally misdirected. Defendants simply refuse to acknowledge the full range of the factual allegations despite a legal obligation to view all such allegations and inferences therefrom in the light most favorable to the plaintiff. *Colburn v. Upper Darby Township*, 838 F.2d 663, 665-66 ((3d Cir. 1988). At bottom, the Match.com defendants proclaim in their Motion that they possessed in effect the unequivocal right as a matter of law to subject the plaintiff and all other subscribers to countless invasions of her privacy or

3

other torts which they and/or their employees might cause. They premise this license to

commit irremediable torts and personal offenses on a  "terms of use" document which,

as *alleged* by them, appeared as a link on their website and which, they conclude,

extinguished all remedies for personal injury except perhaps a refund of the monthly

charge.  As discussed below, however, defendants' arguments are a "house of cards"

and cannot support a motion to dismiss in view of the allegations of the Complaint and

applicable law.

For all the reasons that follow, defendants' Motion to Dismiss under Rule

12(b)(6), F.R.Civ.P., fails decisively on all points and must be denied.

LEGAL DISCUSSION

<u>A. Defendant's Motion to Dismiss Fails to Assume the Truth of Allegations
of the Complaint and Injects Numerous Factual Predicates Which, if
Relevant at All, May be Explored in Discovery</u>

As a threshold matter, a motion to dismiss is not a vehicle for resolving factual

disputes. The document, attached as Exhibit A, which defendants have injected into

this case as a defense is not relied on in the Complaint and is hotly disputed by plaintiff

both as to its authenticity and as to its asserted applicability in the circumstances of this

case. Pretending that there is no dispute about this document, defendants have

stepped out of the procedural framework of a Rule 12(b)(6) motion to dismiss and

disregarded the right to have a jury make findings. Indeed, there are numerous

unresolved issues surrounding defendants' Exhibit A.  Although entitled a "Terms of

Use Agreement," for example, it bears the date 11/21/2002 on its face, *presumably*

indicating that it was printed from the defendants' website on that date. The Complaint,

however, alleges that plaintiff subscribed to the service in March 2003. It remains as

4

speculation whether this particular "linked" document even appeared on the defendants' website in March 2003, much less embodied a contract.  Defendants' assertions that Exhibit A was "signed" by the plaintiff (Defendants' Memo at 6) are not merely absent from the Complaint itself, but are unsupported by any facts supplied by defendants in putting forward their defense. Significantly, the Match.com website even as it *now* exists does not even require that the link (designated only as "terms of use") be automatically opened before the service can be ordered.  Apparently, therefore, the site was deliberately constructed so that a subscriber could begin the service without ever laying his or her eyes on the cyber-linked document cryptically called "terms of use."  Notably, this "terms of use" reference does not hint at the non-negotiable legalese which defendants claim erased all of a subscriber's legal rights to any remedy in tort or contract, but which paradoxically proclaims across the top  –  "Meet your Match Anonymously and Securely, Locally or Internationally at Match.com.".  See Defendants' Exhibit A (emphasis added).

There are a myriad of first-impression Internet issues that could arise from an exploration as to whether the linked document which defendants attach as Exhibit A is worth the paper it was not written on. Fuller factual development would be required before any legal conclusions may be drawn as to whether the alleged document is accurate and/or has any legal effect. Fortunately, however, the Court need shoulder such issues here. Indeed, the question whether Exhibit A is an embodiment of a "contract" need not be reached at all because the only portion of Exhibit A offered by defendants as substantively relevant to their Motion is the "Limitation of Liability" clause. As discussed below, that clause cannot legally apply to this personal injury invasion of

5

privacy action – not even under the California law which defendants pick and choose

for this issue. In any event, it is only if the Court were to rule that the inapposite

Limitation provision would in itself actually bar this action that a determination of the

precise status of Exhibit A would be required.[1]

> B. The Choice-of-Law Provision in Defendants' Exhibit A, Even if that
> Document Were Assumed Arguendo to Constitute a Contract, Does Not
> Force California Contract Law Upon Plaintiff, As California Has No
> Substantial Relationship to the Transaction and Parties

In this case, Match.com defendants have their principal place of business in

Texas and are, based on defendants' Rule 7.1 notice, apparently incorporated in

Delaware. Plaintiff, of course, was a citizen of Pennsylvania. California had no

relationship to plaintiff's subscription at all. The choice of law clause in the disputed

Exhibit A, which selects substantive California law exclusively, is itself patently invalid

under Section 187 of the Restatement, Second, Conflict of Laws, and would not be

followed in Pennsylvania, the forum state, even if Exhibit A were to be deemed a

contract. Section 187 provides as follows:

> § 187.  Law of the State Chosen by the Parties
> (1) The law of the state chosen by the parties to govern their contractual
> rights and duties will be applied if the particular issue is one which the

---

[1] Notably, apart from defendants' broad contentions about the Limitation of Liability clause, the document in defendants' Exhibit A simply does not address the particular subject of an invasion of privacy committed against a subscriber by defendants and defendants' employees. It appears by its own terms only to contemplate possible disputes about what is shown on the dating website and possible injuries by other users of the dating service. There is nothing in the document to indicate that intentional torts by employees of Match.com was ever contemplated. As the promise of "anonymity" and "security" runs across the top of defendants' Exhibit A itself and is inherent in defendants' promotion of the service, there appears to be no question that defendants absolutely agreed not to commit torts against plaintiff's privacy interests.

parties could have resolved by an explicit provision in their agreement directed to that issue.

(2) **The law of the state chosen by the parties to govern their contractual rights and duties will be applied**, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, **unless** either

(a) **the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice**, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

(3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law. [Emphasis added.]

*Schifano v. Schifano*, 324 Pa.Super. 281, 290, 471 A.2d 839, 843 (1984).

Moreover, defendants show their weak hand by picking and choosing only those provisions of California law they want. For example, defendants' Exhibit A contains a forum-selection clause saying that venue is in California, but yet defendants waive any challenge to venue in Pennsylvania. The so-called "terms of use" also states that <u>all</u> substantive California law applies, and yet defendants <u>concede</u> that *Pennsylvania law* applies to all tort issues, reserving California law for contract issues.[2]   What this means is that defendants' putative adhesion "contract" is nothing more than an optional click-on whose invalidity danced around by Match.com and not defended generally.

The conclusion is inescapable that the law of Pennsylvania, the forum state where personal jurisdiction and venue are unchallenged, must control the choice of law

---

[2] Defendants concede that Pennsylvania law applies to all tort issues in this case and that there is no substantial difference between Pennsylvania law and California regarding the tort law at issue here: "For purposes of this Motion, Match.com will rely upon Pennsylvania law to evaluate the tort claims." *Id.* at 5.

7

as set forth in section 187, and that in accordance with clear law there is no legal basis

binding the plaintiff to a choice of any California law even on the narrow subject of

contracts – even if Exhibit A were deemed to have some validity.

### C. Defendants' Limitation of Liability Would Be Inapplicable Even Under California Law

Moreover, the plaintiff's Complaint alleges an invasion of privacy tort referred to

as "intrusion upon seclusion." This is the result of intentional tortious activity for which

defendants are liable as alleged in the Complaint. Defendants' assumption that

California law might, on a sliding scale analysis of six factors, sometimes allow a

limitation of liability for simple negligence is meaningless on its face. Even the California

cases defendants cite explain that a limitation at best can extend in some cases to

simple negligence claims but never to intentional wrongs and reckless behavior. *E.g.,*

*Gardner v. Downtown Porche Audi,* 180 Cal.App. 3d 713, 716, 225 Cal.Rptr. 757

(1986)(citing Restatement policy allowing "exempting from liability for ordinary

negligence  . . . where no public interest is involved."); *Health Net of California, Inc. v.*

*Department of Health Services*, 113 Cal.App. 4th 224, 232-33 (Third Dist. 2003).

Indeed, limiting liability for intentionally hurtful conduct would upset both the policy of

the California statute and the assessment of the public interest by the Courts in

approving limited and selected limitations in some arms length transactions. The

present case would not only survive the complex sliding scale addressed in *Gardner*,

which involved only property loss, but it would not even be subjected to such a scale

because the Limitation provision suggested by defendants would not even make it to

the scale. Notably, defendants' proposed Limitation clause on its face sweepingly

8

attempts to eliminate any punitive damages against it, thus indicating a clear and

knowing disregard even of the California law which it purport to have chosen. California

law would not approve the proffered Limitation provision itself or apply it to this case.

Defendants, of course, do not even claim that Pennsylvania law would allow any such

limitation in the circumstances alleged.

> D. Assuming the Truth of the Allegations in the Complaint and Inferences
> Therefrom, the Complaint States a Claim Against Defendants Themselves
> for the Wrong and Injury Caused by Their Employee(s) and, Therefore,
> This Matter Must Proceed to Discovery

> 1. *Defendants' Own Negligence and Recklessness Was an Operative
> Factor in Placing Their Employee(s) in the Position to Commit the
> Invasion of Privacy Tort and in Producing Their Employee(s)' Conduct,
> Consequently Making Defendants Liable for the Acts of their Employee(s)
> Independently of the Issue of "Scope of Employment"*

Defendants have completely ignored the broad and independently dispositive

principle of Pennsylvania law by which an employer is always responsible for acts of the

servant, regardless of the scope of employment**,** if the master's own negligence was in

some way involved in putting the employee in the position to do the harm. This principle

is stated in the very same Restatement of Agency section that makes a master liable

for an employee's conduct within the scope of employment. Section 219, Restatement

(Second) of Agency, is titled generally, "When Master is Liable For Torts of His

Servants." As stated recently in *Lidwell v. University Park Nursing Care Center*, 116

F.Supp.2d 571, 580 (M.D. Pa. 2000):

> Even if an employee is **not** acting within the scope of employment, there are
> instances in which the employer may be liable.  These instances are those
> described in the following provision:
>> A master is not subject to liability for the torts of his servants acting outside the
>> scope of their employment, **unless**:

(a) the master intended the conduct or the consequences, or
(b) **the master was negligent or reckless**, or
(c) the conduct violated a non-delegable duty of the master, or
(d) **the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation**.

Restatement (of Agency) Second, § 219(2) (emphasis added).

The liability of the master for the torts of the servant thus extends under section 219(2) even to the conduct by a servant that is beyond the scope of employment if the employer was negligent or reckless concerning the employee. If defendants read the Complaint and properly credited its allegations they would have seen that this was precisely such a case. Plaintiff has, *inter alia*, expressly pleaded defendants' own corporate negligent and reckless conduct in respect to hiring, supervision and lack of security measures, all of which materially enabled their employees to use their position with defendants to commit the invasion of privacy. For example, the Complaint addresses as follows, *inter alia*, the defendants' own negligent and reckless involvement which in turn creates liability for the acts of their employees under section 219(2):

42.   Defendants were at all times aware, and reasonably should have been aware, that, as a woman selecting a same gender preference, the protection of her privacy was of heightened importance to her mental, emotional and physical well being and security, and that a breach of that privacy could reasonably lead to harassment and hateful conduct directed against her and to emotional and physical harm.

43.   Nevertheless, on or about March 17, 2003, defendants, through their own conduct and that of their agents, servants and employees acting within the scope and course of their employment, caused the plaintiff's right of privacy to be violated by the substantial and highly offensive e-mails and false subscriptions, as set forth above.

44. Defendants negligently and recklessly allowed access to and use of private information by defendants' agents, servants and employees (including those designated to respond to customer telephone calls) who

10

were not adequately and reasonably screened with regard to age, intelligence, character, education, background, qualifications and social attitudes toward females seeking same gender dating opportunities; who were not adequately compensated, trained, monitored, compartmentalized and/or supervised; and who were not electronically barred from "spoofing" or falsely assuming the identity of subscriber e-mails and using indecent language in e-mails such as was used in the e-mails to plaintiff.

45.  Contrary to the representations and advertisements by which it created a reasonable expectation of security for private information of plaintiff as a subscriber, defendants allowed their agents, servants and employees freely to intrude upon plaintiff's seclusion by conducting significant and highly offensive sexually predatory and hateful activities injurious to plaintiff.

Inexplicably, the defendants' Motion to Dismiss simply pretends that these straightforward allegations directed squarely to the command level do not even exist in the Complaint, instead of presenting all the allegations of the Complaint in the light most favorable to the non-moving plaintiff.

Subsection "d" of section 219(2), moreover, embraces the important additional concept that (even without negligence by the employer) if the employer gave the employee the means to commit the tort, thereby allowing the agency relation to facilitate the commission, the employer cannot escape liability for the acts of the employee. In this case, as the allegations plainly cover, the employees were put in a position at the workplace to use the tools and position afforded them by defendants to freely invade plaintiff's privacy. They admittedly did so with disgusting obscenity and a deluge of unwanted registrations to web sex groups by spoofing plaintiff's e-mail address and pretending to be plaintiff herself.

Under section 213, Restatement (Second) of Agency, too, an employer has independent, if derivative, liability even for "failing to prevent" harmful actions of

employees (regardless of "scope of employment") if the employer is negligent or reckless in regard to the employee, as alleged in this case. *E.g.*, Section 213 & subsection (d). *See R.A. v. First Church of Christ*, 748 A.2d 692, 697 (Pa. Super. 2000). Here it is alleged, for instance, that defendants placed their employees into the position of dealing with the sensitive socio-sexual dynamics of same-sex date matching that could especially lead one who is ill-suited, ill-trained, or ill-supervised to cross the line of legal responsibility and cause harm. This independent liability is echoed in § 317 of the Restatement (Second) of Torts as well.  *See R.A. v. First Church of Christ*, supra, at 697.  Indeed, if ever there was a circumstance in which an employer should anticipate excesses that are potentially extremely offensive, it is in giving an untrained and unsupervised male the position and license to deal with women in a setting that relates to diverse sexual orientations. If defendants put a bull in a china shop, they would have no one but themselves to blame when the delicate items are smashed.

Even if, *arguendo*, the conduct of Mr. Riios and any other employees involved were deemed outside the scope of employment, therefore, the master is still liable "for torts of his servants" under section 219(2) and is independently liable for their conduct under other established law.

> *2. Applicable Pennsylvania Law Establishes that the Alleged Acts by Defendants' Employee(s) Were In Any Event Within the Scope of Employment Even If Those Acts Were "Outrageous"*

Defendant acknowledges that plaintiff did indeed plead that their employees acted within the "scope of his employment" for defendants, but they claim nevertheless that this pleading lacked sufficiently specific details to suit their preferences. Rule 8,

F.R.Civ.P., of course, does not require factual specificity in pleading on this subject and plaintiff must in any event be allowed the opportunity for full discovery on what defendant did or did not do in establishing the scope of Mr. Riios' and others' employment.

Beyond this procedural irregularity and putting aside momentarily that "scope of employment" is not an essential element of defendants' liability for the conduct of its employees as discussed above, defendants are nevertheless also completely wrong in their claim that their employees as a matter of law exceeded the "scope of employment" if their conduct was outrageous. Defendants wrongly presume that, because the Complaint describes the underlying conduct as "outrageous" (a required element for punitive damages under Pennsylvania law), Mr. Riios and any others must therefore have been outside the scope, thereby precluding vicarious liability. Defendants have not only jumped the gun by presuming facts against plaintiff, but they have misstated the multifaceted law governing vicarious liability for acts of an employee.

Pennsylvania law (which defendants concede applies) routinely recognizes vicarious liability by an employer specifically for "outrageous" acts of employees leading to awards of punitive damages against the employer. *Dean Witter Reynolds, Inc. v. Genteel*, 346 Pa.Super. 336, 499 A.2d 637 (1985), *accord*, *Butterfield v. Giuntoli*, 448 Pa.Super. 1,  670 A.2d 646 (1996)(not only recognizing that punitive damages may be awarded against an employer based on vicarious liability for outrageous acts of a servant, but also establishing the doctrine that such damages are routinely insurable). The Third Circuit in the seminal case of *Chuy v. Philadelphia Football Club,* 595 F.2d 1265, 1279 (3d Cir. 1979), has plainly recognized the liability of the employer for

13

outrageous acts of the employee as a longstanding feature of the law of Pennsylvania.
There it was shown that a team physician stated publicly that a team member had a fatal
disease that he never had.

> In sum, we believe that Pennsylvania courts would adopt a standard of vicarious
> liability for punitive damages which would encompass the conduct of Dr. Nixon
> [the team physician] found by the jury to be *outrageous*. The award of such
> damages is properly left to the jury as factfinder. *[Id.* at 1279 (italics added).*]*

*Chuy* was cited by the Pennsylvania Supreme Court with approval in *Huy v. Angelone,*
554 Pa. 134, 720 A.2d 745, 754 (1998).[3]

Moreover, the alleged conduct of the employees in this case had very real
connections to the defendants' sexually-related Internet business, as discovery will
doubtlessly more fully reveal. Defendants are in the business of marketing and selling an
Internet service for people seeking dating opportunities with members of their own sex.
Human sexuality and sexual interactions are at the very center of defendants' chosen
business.  Depending on how badly defendants behaved in negligently hiring, training
and supervising their employees and in giving unrestricted access to unsecured
personal information of the plaintiff female subscriber, the employees' acts in crossing
the line into hostile and frightening perversion may have been perceived to be related to
his employer's sexually-related Internet service and within the license given to him as an

---

[3]  The principle of binding the employer to the employee's outrageous acts
through a vicarious liability for punitive damages is not some unusual feature of
Pennsylvania law alone, but has also been acknowledged by our Circuit to be the law of
New Jersey as well. *Schiavone Construction Co. v. Time, Inc.*, 847 F.2d 1069, 1093
n.36 (3d Cir. 1988)("[b]ecause Sandy Smith was an employee of Time, Time is
responsible for Smith's actual malice under a theory of respondeat superior). The
outrageousness of an employee's conduct never creates immunity for the employer, as
defendants here suggest, even if there were no direct negligence by the employer of
the sort that is so clearly alleged here.

employee.

Having entered this profitable sex-related field and having facilitated the plaintiff's injury through their own ineptness to protect her privacy, defendants cannot acquire immunity merely by declaring that they did not instruct the employee to go quite as far as he did. That employee, Mr. Riios, for example, obviously felt free to use whatever information and technology was made available to him by defendants and to engage the subscriber in the kind of obscene communication that certain off-color telephone and Internet services market so profitably, albeit where the recipient consents. Just as many ventures sell sexually explicit talk to callers, Mr. Riios may have been led to believe that sexually suggestive communications to the subscriber was within bounds. Moreover, he and/or other employees gauged their offensive communications specifically to plaintiff's status as a woman seeking dating opportunities with women, having expressly referred to her "profile" and having spoofed her e-mail so as sign her up for same-gender sex groups.[4]

"Scope of employment" is, of course, never defined by whether the corporate board in retrospect would have expressly authorized  the act in question. The existence of even a faint connection to the work, however, will fully satisfy all scope requirements. Moreover, this is certainly not an instance in which Mr. Riios or others acted out of any

_____

[4]  Even California law, which defendants equate as substantially identical with Pennsylvania law on matters related to the tort, Defendants' Memo at 4, clearly includes the acts of the servant Mr. Riios as within the "scope of employment." E.g., *Mary M. v. Los Angeles,* 54 Cal.3d 202, 216-221, 285 Cal.Rptr. 99, 107-111, 814 P.2d 1341, 1349-1352 (1991) (en banc) (police officer raped motorist after placing her under arrest); *Carr v. Wm. C. Crowell Co.*, 28 Cal.2d 652, 171 P.2d 5 (1946) (employer liable for actions of carpenter who attacked a co- employee with a hammer).

personal out-of-the-office reasons, as the only contact with the plaintiff was that created

by the employment. If there is any doubt at all the issue must be developed factually, not

summarily dismissed with prejudice as defendants bluntly demand.  Whether a person

acted within the scope of employment is a classic question for the jury. *Orr v. William J.*

*Burns International Detective Agency,* 337 Pa. 587, 12 A.2d 25 (1940);  *Straiton v.*

*Rosinsky,* 183 Pa.Super. 545, 133 A.2d 257 (1957).

> E. Defendants Badly Distort Both the Nature of the Allegations in the
> Complaint and the Applicable Substantive Law In Asserting that the Mere
> Existence of a Contractual Relationship Between Plaintiff and Defendants
> Constitutes a Forfeiture of all Tort Claims on a "Gist of the Action" Theory

Defendant's conclusion that plaintiff is bootstrapping a tort out of a breach of

contract distorts the existing law puts the cart before the horse and is hinged on a

misapplication of cases that do not even involve personal injury torts.

Defendants turn the applicable law upside down by trying to use the "gist of the

action" principle to smother a personal injury invasion of privacy case merely because

there is a separate contract claim raised Count III.[5] Even their leading case, *eToll, Inc. v.*

*Elais/Savion Advertising, Inc.*, 811 A.2d 10, 14-15 (Pa. Super. 2002), expresses the

exact opposite –  that "'a claim should be limited to a contract claim *when the parties'*

*obligations are defined by the terms of the contracts, **and not by the larger social***

***policies embodied by the law of torts.***'"  *Bohler-Uddeholm Am., Inc. v. Ellwood Group,*

---

[5] The Federal Rules of Civil Procedure do not require an election of remedies. To
the contrary, the plaintiff is invited by Rule 8(e)(2) to plead alternative claims in different
counts. That subsection specifically provides that "the pleading is not made insufficient
by the insufficiency of one or more of the alternative statements." Indeed, even
inconsistent claims (though there are none here that are inconsistent) may be raised
and must considered independently.

*Inc.,* 247 F.3d 79, 104 (3rd Cir. 2001), *cert. denied,* 534 U.S. 1162 (2002)(emphasis added). In stating primarily an invasion of privacy action, plaintiff has expressly drawn upon the social policy imbedded in a long history of tort law.

From *eToll, Inc.* to all the other cases cited, defendants have neglected to point out that the "gist" theory has never been applied to displace any personal injury tort, but rather has occasionally been applied only where solely economic harm arose from a breach of contract which then spawned other overlapping claims for the same purely economic losses in the form of fraud or interference with contract.

Defendants' citation to this Honorable Court's decision in *Peoples Mortgage Company, Inc. v. Federal National Mortgage Ass'n*, 856 F.Supp. 910 (E.D. Pa. 1994), only exposes the gimmickry of defendants' effort to make tort law disappear. In *Peoples*, this Court merely rejected an attempt to bootstrap a breach of contract claim for commercial damages, into a spurious claim against the defendant for tortiously interfering with the very contract it allegedly breached as a party. The narrow circumstances of the Court's ruling lends defendants no support here.

In the present case, the contractual aspects of the relationship between defendants and plaintiff are not by any stretch more expansive in kind than those underlying a doctor-patient, lawyer-client, manufacturer-purchaser, landlord-tenant, bank-customer or any of a host of conceivable relationships in whose context a personal injury tort may occur. Contractual relations routinely provide a backdrop for tort actions in, for example, medical malpractice, legal malpractice, product liability, slip and fall, invasion of privacy or any of the array of tortious personal harms to which Pennsylvania has always applied tort law and a tort statute of limitations despite an underlying

17

contract.

Most importantly, defendants do not bother to mention that the Superior Court in *McGuire v. Schubert*, 722 A.2d 1087, 1092 (Pa. Super. 1998), has already expressly upheld an intrusion upon seclusion claim brought by a bank customer against a bank for failing to maintain the confidentiality of an account. The Court there upheld the privacy claim even as it expressly acknowledged that the legal relationship between the bank and customer was contractual in nature. The only requirement in stating the independent invasion of privacy cause was that the plaintiff allege the essential elements of that tort.

The Match.com defendants cannot dictate out of existence the great body of established tort law using a "gist of the action" guise. Although they are bold in their attempt, they ultimately fail to make the contract tail swallow the tort dog. The foremost cause is pleaded in tort. That is how the action is clearly framed and presented and how the Complaint must be viewed. That invasion of privacy tort plainly fits the classic mold recognized since memory has run not to the contrary both in Pennsylvania and elsewhere. The existence of a contractual relationship merely created the context in which the defendant to harm the plaintiff in tort.

> F. In Full Accord with the Requirements of Rule 12(b)(6), the Complaint in its Very First Count States a Tort Claim for Invasion of Privacy Arising from the Using Personal Information Clandestinely to Subject Plaintiff to Obscene and Humiliating Verbal Assaults and To Impose Upon Her By Misappropriation of Her E-Mail Identity Unwanted Memberships in and Communications from Internet Sex Groups

Plaintiff's privacy claim alleges primarily an intrusion upon seclusion. Section 652B of the Restatement (Second) of Torts states:

§ 652B. Intrusion upon Seclusion
One who intentionally intrudes, physically or otherwise, upon the solitude

or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

*Harris v. Easton Publishing Co.*, 335 Pa.Super. 141, 153, 483 A.2d 1377, 1383 (1984).

Defendants' employees, with the aid and complicity of defendants' own corporate negligence and recklessness, did violence to plaintiff's "solitude" and "seclusion." First, the plaintiff's private, confidential information was invaded and used to contrive and execute the combination of offensive communications and the harassment of concocting false memberships for the plaintiff in sex groups. The private information which was raided for this purpose included plaintiff's same-sex orientation, e-mail identity and a storehouse of other financial and identifying data that was provided to defendants to enable them to perform their role in mediating anonymous contacts with potential matches.  Once that information was invaded, it was then used to orchestrate a the campaign of offensive and harassing unsigned communications. This included use of plaintiff's e-mail to convey highly offensive obscenities:  "Does your C - -T smell . . . . lol J/J Let me know what you think of my profile. Oh, by the way . . . . would you suck my c- - k until it cummmms?"  and  "Hey would please let me eat out????? I promise to make you cummmmm!!!!!" Additionally, plaintiff's private information was used to further humiliate her through the creation of faked memberships in Internet sex groups, causing plaintiff to receive unwanted communications at her e-mail address and requiring her to "unsubscribe" from each such group. The name of the perpetrator(s) was hidden, creating even more terror that her private information was being spread injuriously and that the solitude and seclusion she thought was preserved when she subscribed to defendants' service had simply become a privacy and security nightmare.

19

The Match.com defendants solicited subscribers with a same-sex orientation only by assuring them the privacy, security and anonymity, which they knew would be necessary to their business endeavor. They then allowed that information to be used by their employees to trample the privacy interests of such a subscriber by converting information confidentially supplied into ammunition for verbal sexual assaults and harassment that ultimately preyed upon the known special vulnerability to reprisals of a person with a same-sex orientation.

Defendants' argue glibly that unwanted telephone calls and calls by persons visiting one's home are not invasions of privacy. They seek to reason that what was done by their employee(s) here is therefore not actionable. While it may be true that a random unwanted call from a telemarketer or a random knock on the door from a leafleteer may not in and of itself support a cause of action for invasion of privacy, that does not remotely resemble plaintiff's allegations here. It is respectfully submitted that not only a civil action but a criminal prosecution would be supported if private information entrusted to a company for confidential business purposes was taken and used by an employee of that company to make phone calls or visits to a woman saying, "Does your C - -T smell . . . . lol J/J Let me know what you think of my profile. Oh, by the way . . . . would you suck my c- - k until it cummmms?"  and "Hey would please let me eat out????? I promise to make you cummmmm!!!!!"[6] The same would be true if that misused private information were misappropriated to create the false, disturbing and humiliating impression that plaintiff herself had registered with sex groups and thereby

---

[6]  The original e-mails do not contain deletions of letters.

welcomed not only the association with such groups but calls and/or visits.

The Match.com defendants can only be pretending not to see the difference between an ordinary telemarketing call and the intrusion alleged here into her private information in order to surround her with obscenities and sex-related harassments. The difference is unmistakable. It must be also be considered, also, that plaintiff's sexual orientation rendered her foreseeably vulnerable to potential retaliation and made the assaults she was subjected to especially upsetting.

Defendants cite *Harris v. Easton Publishing Co.*, supra, in a footnote for the proposition that the intrusions perpetrated on her were caused by her voluntary disclosure of information. This is an indefensible misreading of *Harris*. In fact, Harris merely held that where a government department had given a publishing company unsolicited information about plaintiff that had been disclosed by the plaintiff to the Department, the publisher had not intruded into any private information or file. The suggestion that the information defendants obtained from plaintiff to perform the role of matching plaintiff **anonymously** was the equivalent of public disclosure makes nonsense of defendants's flood of privacy assurances. Just as in *Hall v. Harleysville Insurance Co.*, 896 F.Supp. 478, 484 (E.D. Pa. 1995), where mere unauthorized examination of a bank account supported an intrusion on seclusion, even without the outrageous additional misuse of the private information shown here and not even disputed by defendants. The same is true in *McGuire v. Schubert*, 722 A.2d 1087, 1092 (Pa. Super. 1998), where the Superior Court upheld an intrusion upon seclusion claim brought by a bank customer against a bank for failing to respect the confidentiality of an

21

account.

The allegations of the present case supply far more than is customarily needed to set forth all the elements of an invasion of privacy claim, and particularly an intrusion upon seclusion claim. It alleges the intrusion upon, examination of and disturbingly injurious use of confidential information. It duly alleges extreme offensiveness and severe anguish and humiliation in an outrageous series of acts that  turned her confidential information into weapons that were used against her solitude and seclusion. All this after being solicited by defendants' advertisements to trust defendants with her information as a same-sex-oriented subscriber.

> G. The Allegations of the Complaint Fairly Make Out a Claim of Breach of
> Fiduciary Duty Arising From the Special Confidential Relationship
> Between Defendants as Intermediaries in an Anonymous Dating Service
> By Which Defendants Undertook to Match Members of the Same Sex

Once again, defendants base a legal challenge to a Count in the Complaint upon a glib characterization of the allegations, rather than the necessary assumption of facts taken in the light most favorable to plaintiff. Naturally it is easy to state the self-serving conclusion that in Count II plaintiff has not alleged any "special relationship" to support a fiduciary duty. But such a tactic is useless where the allegations showing the fiduciary relationship are truly present.

The standard for determining a fiduciary relationship involves principally entrustment and dependency. Once a subscriber who has been solicited from a group whose sexual orientation has often witnessed social retribution actually believes the Match.com pitch about privacy in putting herself online anonymously and thereafter controlling any contacts that might produce, the subscriber is at the complete mercy of

the company not to cause the information to be to subject her to vile e-mails, faked

prurient sign-ups with smut sites and other misuse of her information. The relationship is

necessarily a fiduciary one because of the personal nature of the information solicited by

the company – information that identifies the plaintiff as a lesbian and which, if

publicized, is likely to produce retaliatory actions. Defendants entice subscribers such a

plaintiff by pretending to have an appreciation for her and the community sharing her

sexual orientation and for the privacy interests involved. When that company turns

around and uses or allows that information to be used to target the subscriber for vile

and disgusting treatment of an explicit sexual nature, then that entity betrays a profound

trust that goes far beyond any run-of-the-mill "commercial transaction" such as buying an

appliance. It is the highly personal nature of the service offered by defendants in this

case, and the promise of secure privacy inherent in the undertaking, that enabled the

Match.com defendants to make money from the same-sex-dating community. These

features all converge to satisfy the classic elements of a breach of fiduciary duty.

In  *eToll, Inc. v. Elais/Savion Advertising, Inc*., 811 A.2d 10, 14-15 (Pa. Super.

2002), a case put forth by defendants, the Court explained that the essence of a

fiduciary relationship is its confidential nature.

> A "special relationship" is one involving confidentiality, the repose of
> special trust or fiduciary responsibilities.   *See Commonwealth v. E-Z-
> Parks, Inc.,* 153 Pa. Commw. 258, 620 A.2d 712, 717 (Pa.Commw.1993).
>  It generally involves a situation where by virtue of the respective strength
> and weakness of the parties, one has the power to take advantage of or
> exercise undue influence over the other.
>       ******
> [T]he critical question is whether the relationship goes **beyond** mere
> reliance on superior skill, and into a relationship characterized by
> "overmastering influence" on one side or "weakness, dependence, or
> trust, justifiably reposed" on the other side. *Basile v. H & R Block,* 777

> A.2d 95, 101 (Pa.Super.2001).   A confidential relationship is marked by
> such a disparity in position that the inferior party places complete trust in
> the superior party's advice and seeks no other counsel, so as to give rise
> to a potential abuse of power.  *Id.* at 102.  [Emphasis added].

It is precisely this "critical element" which plaintiff has pled and which defendants have

gone out of their way to ignore.

The Complaint alleges, for instance:

> 53.   Defendants entered into that contractual relationship with full
> knowledge of plaintiff's same-gender dating preference and after having
> given assurances and promises of her privacy as set forth expressly and
> impliedly in their published privacy policy appearing on their Internet web
> site, and otherwise as is inherent in and implied from the nature of the
> service and the plaintiff's selection of a same gender preference.
> 54.   Defendants, by agreement, assumed control over the security
> of the private information of the plaintiff in their hands, and plaintiff
> became exclusively dependent upon defendants for the protection of her
> privacy and security against Internet abuse and against such intrusions
> upon her seclusion and invasion of her privacy as in fact occurred.
> 55.   Nevertheless, unbeknownst to plaintiff, defendants knowingly
> maintained a system allowing agents, servants and employees to access
> and use plaintiff's e-mail and send e-mails to her from within the
> Match.com operation, "spoofing" or falsely assuming the identity of the
> plaintiff and using indecent language in such e-mails, and allowing access
> to private information to establish memberships in Internet groups while
> posing as plaintiff so that plaintiff would then receive communications
> from such groups.
> 56.   Plaintiff was rendered highly vulnerable to injury by virtue of
> having given the private information which defendants required and
> obtained in subscribing to defendants' service and by virtue of having
> elected the same-gender dating preference which defendants provided.
> 57.   Defendants knew and/or reasonably should have foreseen
> that the non-private dissemination and/or improper handling of such
> private information could subject plaintiff to severe scorn, ridicule,
> humiliation, shame, harassment, hatred, retaliation, identity theft and
> extreme consequential personal suffering and loss.

These allegations, combined with allegations that defendants represented that their

service was anonymous, focus squarely on the intrinsic confidentiality of the information

with which the defendants were entrusted.

24

Assuming the truth of plaintiff's allegations and taking them in the light most favorable to her, they plainly refute the defendants' assertion that nothing distinguishes this case from any commercial transaction. To the contrary, a dating service is a very personal matter and all of defendants' advertising supports the impression that such personal interests will be handled discreetly and privately and, to the extent wished by a subscriber, anonymously. See also paragraphs 7 & 28, Complaint. It is not understood why defendants would waste their time arguing that this case is no more than a "commercial transaction" when such personal matters are entrusted to defendants and where, as alleged here, the peculiar market of same-sex dating raise heightened risks of misuse of private information that if abused could target a whole community of people for retaliation. There is, after all, a reason the military has a "don't ask, don't tell" policy.

> H.  Although Here the Contract Breach Claim is Merely Alternative to the Primary Tort Claim, Pennsylvania Recognizes that Compensatory Damages in the Nature of Emotional Distress May Be Recovered Where Such Harm Was Likely to Result from the Breach

Defendants are also flat wrong in saying that the damages claimed are not alternatively recoverable pursuant to Count II alleging a breach of contract.  In *Birth Center v. St. Paul Companies, Inc.*, 567 Pa. 386,  787 A.2d 376 (2000), the Pennsylvania Supreme Court stated:

> We held [in *D'Ambrosio v. Pennsylvania national Mutual Casualty Insurance Co.*, 494 Pa. 501,  509, 431 A.2d 966, 970 (1981)] that where the allegations in the complaint failed to show how the insurer acted in bad faith, we would not allow the insured to recover punitive damages or damages for emotional distress on his *trespass* cause of action.   The contractual cause of action was never before the Court. **In fact, we expressly stated that, in an appropriate case, an insured could recover compensatory damages based on a contract cause of action, because of an insurer's bad faith conduct.**  We explained:

25

> The possibility cannot be ruled out that emotional distress
> damages may be recoverable on a *contract* where, for example,
> the *breach* is of such a kind that serious emotional disturbance
> was a particularly likely result.... The present record falls far short
> of establishing such conduct. [Emphasis added]

If ever there was an example of likely emotional harm resulting from the complete

disregard of promised privacy, it is this case. An opportunity for full discovery can only

strengthen this alternative ground for the award of compensatory damages for emotional

distress. Notably, this principle is now a matter of general law in Restatement (Second)

of Contracts § 353. *See Novick v. Unumprovident Corp.*, 2001 WL 793277 (E.D. Pa.

2001)(and numerous cases cited therein).[7]

CONCLUSION

WHEREFORE, plaintiff respectfully requests that defendants' Motion to Dismiss

be Denied.

Respectfully submitted:

By:   WPM2011
      WILLIAM P. MURPHY, ESQ.
      HOWARD K. GOLDSTEIN, ESQ.

      MURPHY & GOLDSTEIN, P.C.
      1616 Walnut Street, Ste. 2000
      Philadelphia, PA 19103
      (215) 731-1230

      Attorneys for Plaintiff

---

[7]   Although California law cannot lawfully apply to this Pennsylvania action due to
the complete absence of a relationship of the transaction to California, there is no
indication in the cases to which defendants have cited that California law has rejected
this specific Restatement principle where applicable, as it is here.

26

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May, 2004, a true and correct copy of the

foregoing Plaintiff's Memorandum In Opposition to Defendants' Motion to Dismiss

Plaintiff's Complaint was, served via first class mail, postage prepaid, upon the following:

Christopher J. Huber, Esq.
Pepper Hamilton, LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799

The foregoing document was filed electronically and is available for viewing and

downloading from the ECF system.

WPM2011_____
WILLIAM P. MURPHY, ESQ.